CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

DANIEL PASTOR (CABN 297948)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7230
    FAX: (415) 436-7234
    daniel.pastor@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> APPROXIMATELY 2,769,378.81 USDT FROM TRON BLOCKCHAIN ADDRESS AND 1,400,058.194019 USDT, 1,331,857.9667 DODO, AND 1,445.2634 PEOPLE FROM BINANCE ACCOUNT <br><br> Defendant. | CASE NO. <br><br> **VERIFIED COMPLAINT FOR CIVIL FORFEITURE *IN REM*** |

The United States of America, through its attorneys Craig H. Missakian, United States Attorney for the Northern District of California, and Daniel Pastor, Assistant United States Attorney, brings this complaint and alleges as follows:

**NATURE OF THE ACTION**

1. This is a judicial forfeiture action *in rem*, as authorized by Title 18, United States Code, Sections 981 and 983.

COMPLAINT FOR CIVIL FORFEITURE          1

2. This Court has jurisdiction under Title 18, United States Code, Section 981, and Title 28, United States Code, Sections 1345 and 1355, as the defendant property constitutes or is derived from proceeds obtained, directly or indirectly, from violations of Title 18, United States Code, Sections 1343, 1349, and 1956, as well as property involved in violations of Title 18, United States Code, Section 1956.

3. This action is timely filed in accordance with Title 18, United States Code, Section 983.

4. Venue is proper because the defendant property represents the proceeds of a crime that may be prosecuted in the Northern District of California. 28 U.S.C. §§ 1355, 1395.

5. Intra-district venue is proper in the San Francisco division within the Northern District of California.

## PARTIES

6. Plaintiff is the United States of America.

7. The Defendant Property consists of 2,769,378.81 USDT tokens seized from **Tron Blockchain Address 1** (TE2QRd16kZfHZz3LRooh2qmCKsQ2gcnbeC); and 1,400,058.194019 USDT, 1,331,857.9667 DODO, and 1,445.2634 PEOPLE seized from **Binance Account 1** (collectively "Binance Funds").

## BACKGROUND ON CRYPTOCURRENCY

8. Cryptocurrency (also known as virtual or digital currency) is a decentralized, peer-to-peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Tether (abbreviated as USDT), DODO, and PEOPLE are types of cryptocurrency. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers.

9. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government or bank; it is generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.

COMPLAINT FOR CIVIL FORFEITURE                 2

10. Cryptocurrency allows users to transact under a layer of anonymity, as opposed to using banks and the traditional financial system. Users control unique electronic "addresses," generally represented as lengthy alphanumeric character strings at which different cryptocurrencies can be stored.

11. To access cryptocurrency on a public blockchain, an individual must use a public address (or "public key") and a private address (or "private key"). The public address can be analogized to an account number while the private key is like the password to access that account. Even though the public addresses of those engaging in transactions are recorded on the public ledger (i.e., the blockchain), the true identities of the individuals or entities behind the public addresses are not recorded. If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity. Cryptocurrency transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous. An individual can send and receive cryptocurrency through peer-to-peer digital transactions or by using a third-party broker. Such transactions can be performed on any type of computer, including laptop computers and smart phones.

12. Various software applications are available to both government and private companies which input publicly available information from the blockchain with proprietary information. These software applications assist with conducting blockchain analysis.

13. Blockchain analysis is the process of inspecting, identifying, clustering, modeling and visually representing data with the goal of discovering useful information about the different actors transacting in cryptocurrency.

14. Clustering is the grouping of a set of cryptocurrency addresses in such a way that addresses in the same cluster are associated with and/or controlled by the same individual/entity. Software applications use open source and proprietary data to cluster addresses together.

15. When conducting blockchain analysis, clusters are useful to law enforcement to determine if a specific address is being controlled by the same individual or associated with a cryptocurrency exchange or other entity.

16. Exchangers and users of cryptocurrencies store and transact their cryptocurrency in many ways. Cryptocurrency wallets exist in various formats such as software (e.g. a cellphone application), hardware (e.g. a USB drive), and physical format (e.g. data written on a piece of paper). Users can also

COMPLAINT FOR CIVIL FORFEITURE          3

store cryptocurrency in accounts controlled by third parties, such as cryptocurrency exchanges (e.g. Binance or Coinbase).

## FACTS

### *Elder Fraud Schemes Targeting U.S. Victims*

17. Law enforcement agencies across the United States have investigated numerous reports of "Tech Support" scams. These scams often originate from call centers in India and target older victims in the U.S. with limited knowledge of technology and a trusting attitude towards phone-based support.

18. Through a variety of social engineering schemes, the scammers convince victims to transfer large quantities of money to financial accounts controlled by the scammers or their co-conspirators. These scams include but are not limited to: (1) convincing victims their computers have been hacked and that they need to pay a certain sum of money to reclaim their data, (2) telling victims illegal activity or content is located on their computers and that they need to pay a certain sum of money or else the scammer will release details of their supposedly illegal actions or content to the public, and (3) convincing victims that the scammer has accidentally transferred a certain sum of money to the victims' bank account and requesting that the victims refund it.

19. Proceeds from these scams are often laundered and ultimately remitted to persons involved in these schemes.

20. In 2023, the Federal Bureau of Investigation (FBI) initiated a joint organized crime investigation into an elder fraud scheme in which money mules used fraudulent Chinese passports to open bank accounts that were then used to withdraw the proceeds of elder fraud scams perpetrated by scammers at Indian call centers.

21. This scheme operated similarly to the general typology of India-based call center scams described above: victims of fraud were scammed by call centers in India and directed to wire money to U.S. based bank accounts which had previously been opened by U.S.-based money mules using fictitious aliases and fraudulent Chinese passports.

22. Once the U.S. victim funds were sent to the money mule bank accounts, the money mules would withdraw the proceeds as cash and provide the cash to their organization to be converted to cryptocurrency, laundered, and ultimately remitted to higher-level members of the scheme.

23. Agents identified a ring of Chinese-national money mules (Money Mules) operating in the San Francisco Bay Area as part of the scheme.

24. Through U.S. victim interviews, surveillance, bank employee interviews, records review, and other investigative techniques, the FBI confirmed that the Money Mules each withdrew fraud victims' funds in cash from Bay Area banks after receiving wires to U.S. bank accounts that they had opened under fictitious names. This scheme is summarized in greater detail below.

25. Beginning in Fall 2022, the manager of the ring of Money Mules ("MANAGER") and the Money Mules opened different bank accounts using aliases that matched fraudulent Chinese passports they had been provided.

26. Their bank accounts received deposits sent by U.S. victims of tech support fraud schemes that generally ranged between $10,000 and $100,000.

*Examples of How the Wire Fraud Conspiracy Operated on U.S. Victims*

**Victim 1**

27. On or about November 1, 2023, Money Mule 1 opened a Bank of America account using an alias that matched a fraudulent Chinese passport.

28. On or about November 16, 2023, Victim 1 (a Northern California resident) received an email from a personal computer helpdesk service stating that his computer support subscription had been renewed for $469.75. The email stated that if Victim 1 wanted to cancel, he should call a phone number in the email.

29. Victim 1 called the phone number in the email and "Kevin" answered. "Kevin" gained remote access to Victim 1's computer after telling Victim 1 that he needed access to issue a refund.

30. Victim 1 filled out a form on his computer while "Kevin" still had remote access. "Kevin" claimed that Victim 1 had filled out the form incorrectly—putting $46,999 as the refund amount instead of $469.75—and that $46,999 had already been transferred to Victim 1's bank account. "Kevin" demanded that Victim 1 return the money immediately.

31. "Kevin" told Victim 1 to call his bank and explain that he had a friend who needed the money for home remodeling expenses. "Kevin" gave Victim 1 wire instructions and repeatedly called Victim 1 until Victim 1 sent the wire.

COMPLAINT FOR CIVIL FORFEITURE                5

32.  On or about November 17, 2023, Victim 1 wired $46,500 from Ally Bank to the Bank of America account belonging to Money Mule 1.

33.  On or about November 20, 2023, Money Mule 1 withdrew $45,000 in cash from a Bank of America branch in San Jose, California.

**Victim 2**

34.  On or about October 30, 2023, Money Mule 2 opened a Bank of America account under an alias.

35.  On or about November 1, 2023, Victim 2 heard a loud sound coming from her computer and noticed that her computer screen appeared to be frozen.

36.  The computer displayed a message from "Microsoft" indicating that fraud was detected on her device and that she should call a phone number shown on her computer screen.

37.  When Victim 2 called the phone number, someone claiming to be "Hector Barnes" from Microsoft answered and claimed that he needed remote access to Victim 2's computer to run a scan. "Hector" claimed that the scan showed Victim 2's computer had been hacked.

38.  While "Hector" still had remote access to Victim 2's computer, he had Victim 2 log into her bank accounts, purportedly to verify that she—and not supposed hackers—had made all the charges that were listed in the accounts.  Victim 2 informed "Hector" that she did not recognize one small transaction in her account at Mountain America Credit Union (likely a legitimate transaction that she did not recognize in the moment), and "Hector" claimed he would notify Mountain America Credit Union.

39.  Later that day, Victim 2 received a call from a "Nick Harris" who said he was from Mountain America Credit Union's Fraud Department.  "Nick Harris" claimed that there had been fraudulent attempts to take money out of Victim 2's account but that he was able to stop the transfers.

40.  "Nick" told Victim 2 that she needed to liquidate her financial accounts and Individual Retirement Accounts (IRAs) and transfer the funds to supposedly safe accounts.

41.  Among the transfers that "Nick" tricked Victim 2 into initiating was one on November 7, 2023, for $28,910 from her Mountain America account to a Bank of America account controlled by Money Mule 2.

\\

COMPLAINT FOR CIVIL FORFEITURE            6

42. Bank of America records show that Victim 2's wire was successfully transmitted. The FBI was able to freeze the funds, however, preventing their withdrawal.

**Victim 3**

43. On or about October 26, 2023, Money Mule 3 opened a Bank of America account using an alias which was listed on a fraudulent Chinese passport with a photo of Money Mule 3.

44. On or about December 5, 2023, Victim 3 received an email purportedly from the same personal computer helpdesk service that was used in the fraud outreach to Victim 1.

45. Victim 3 had, in fact, purchased a PC care plan from that computer helpdesk service for which Victim 3 paid an annual fee. The email claimed that the renewal fee was increasing to $500 and provided a phone number to call if Victim 3 had questions.

46. Victim 3 called the phone number and spoke with a "Tom Dias." "Tom" gained remote control of Victim 3's computer and instructed Victim 3 to enter $500 into a form on his computer. After entering $500, the number quickly changed to $50,000 and disappeared from the screen. "Tom" said that $50,000 was already being transferred to Victim 3 and that his boss would kill him for the error.

47. To correct the supposed error, "Tom" convinced Victim 3 to send a $25,000 wire from Victim 3's Wells Fargo account to a Bank of America account controlled by Money Mule 3.

48. Bank of America records show that Victim 3's $25,000 wire was deposited to Money Mule 3's bank account on or about December 5, 2023.

49. Law enforcement observed Money Mule 3 visit a Bank of America branch in Richmond, California, on or about December 5, 2023.

*The Money Laundering Conspiracy*

27. Once the fraudulently obtained funds from U.S. victims were on deposit in the Money Mules' bank accounts, the MANAGER and the other Money Mules withdrew them in large cash withdrawals—emptying or nearly emptying the bank accounts.

28. The MANAGER collected bulk cash from the other Bay Area Money Mules who were allowed to keep a small percentage of their cash withdrawals as compensation.

29. In April 2024, the MANAGER and the other Money Mules were arrested by the FBI and prosecuted in the Northern District of California.

COMPLAINT FOR CIVIL FORFEITURE           7

30. Through interviews with the Money Mules, agents learned that the MANAGER regularly collected the bulk cash which the conspirators withdrew from the bank accounts.

31. After collecting the cash, the MANAGER would generally meet with the courier of a peer-to-peer cryptocurrency exchanger (CRYPTO EXCHANGER) in San Mateo County.

32. A peer-to-peer cryptocurrency exchanger is a person who trades bulk cash for cryptocurrency or vice versa in exchange for a fee. This conversion of cryptocurrency to fiat currency, or vice versa, is done outside the context of a licensed cryptocurrency exchange such as Binance or Kraken, which are subject to record keeping requirements and which must maintain Know-Your-Customer (KYC) Information that generally includes a passport photo or national ID card.

33. The MANAGER delivered the cash fraud proceeds withdrawn by the Money Mules to a courier who worked for the CRYPTO EXCHANGER.

34. The CRYPTO EXCHANGER would then transfer the equivalent amount of USDT, minus fees, to the MANAGER'S boss (hereinafter "FRAUD BOSS").

35. To facilitate the exchange, the MANAGER provided the CRYPTO EXCHANGER with the FRAUD BOSS's cryptocurrency address: **Tron Blockchain Address 1**.

36. During a search of the MANAGER'S cell phone, agents located a WeChat message thread with the CRYPTO EXCHANGER. The MANAGER asked the CRYPTO EXCHANGER what the conversion fee was. The CRYPTO EXCHANGER told the MANAGER the conversion rate was 2%.

37. The MANAGER asked the CRYPTO EXCHANGER if they could reduce the rate 1%, as they wanted a long-term relationship with the CRYPTO EXCHANGER. The CRYPTO EXCHANGER replied that they charged 2.5% for customers who committed fraud, to which the MANAGER responded: "OK (cover-face emoji)".

38. The WeChat message thread showed that the MANAGER contacted the CRYPTO EXCHANGER when the MANAGER had bulk cash to exchange for USDT.

39. The MANAGER provided **Tron Blockchain Address 1** as the address where the USDT should be sent for nearly all these exchanges.

40. When the CRYPTO EXCHANGER was able to make the exchange, they would generally direct the MANAGER to meet with their courier to hand over the bulk cash.

COMPLAINT FOR CIVIL FORFEITURE          8

41. To confirm the transfer of USDT to **Tron Blockchain Address 1**, the CRYPTO EXCHANGER sent the MANAGER a screenshot of the completed transaction via WeChat.

42. In effect, these WeChat messages provide a ledger of transactions between the MANAGER, the CRYPTO EXCHANGER, and the FRAUD BOSS.

43. From about July 2023 through March 2024, the WeChat message thread between the MANAGER and the CRYPTO EXCHANGER showed about 43 transfers for a total of about 3,797,854 USDT, which is approximately $3.8 million.

44. Agents' review of publicly available data from the Tron Blockchain confirmed that the USDT transfers discussed in the WeChat messages occurred on the Tron Blockchain.

45. In July 2024, a United States Magistrate Judge in the Northen District of California signed a seizure warrant for approximately 2.76 million USDT held at **Tron Blockchain Address 1**.

46. The seizure warrant was later executed by the FBI. The roughly 2.76 million USDT from **Tron Blockchain Address 1** was transferred to the custody of the U.S. Government.

### Blockchain Tracing and Identification of the Defendant Property

44. Based on the information provided by the MANAGER of the Money Mules, agents traced the flow of funds through **Tron Blockchain Address 1** using publicly available blockchain data and a commercial blockchain intelligence tool available to law enforcement.

45. Agents found that **Tron Blockchain Address 1** was an un-hosted address on the Tron blockchain, meaning that it was not attributed to an entity, such as a cryptocurrency exchange, which often require know-your-customer (KYC) identifying information such as a passport or national ID card.

46. **Tron Blockchain Address 1** was initiated on or about January 10, 2023, with an input transaction of about 5,467.93 TRX from a Binance hot wallet.

47. **Tron Blockchain Address 1** appeared to function primarily as a pass-through address, receiving and sending assets of similar value in rapid succession.

48. **Tron Blockchain Address 1** was involved in over 3,900 transfers.

49. **Tron Blockchain Address 1** received and sent over 20 million USDT, transacting a volume of over 40 million USDT since it was initiated on or about January 10, 2023.

COMPLAINT FOR CIVIL FORFEITURE                9

50. Despite its use as a pass-through address, **Tron Blockchain Address 1** slowly built value over time, ending with a balance of over 2.7 million USDT by May 2024.

51. Through further blockchain tracing of the input and output addresses connected to **Tron Blockchain Address 1** and information obtained from Binance, agents identified **Binance Account 1**, which was registered to a foreign national.

52. **Binance Account 1** included KYC photos of a subject who the MANAGER identified as the FRAUD BOSS.

53. Based on a comparison of the Binance KYC images with a picture taken of the FRAUD BOSS by U.S. Government officials related to an immigration proceeding, agents identified the holder of **Binance Account 1**.

54. Many cryptocurrencies and associated blockchain protocols require a transaction fee—often referred to as a gas fee—to transact on that blockchain. Generally, the transaction fees must be paid in the native currency of the associated blockchain.

55. For example, when transacting USDT on the TRON chain, the user must first send enough TRX to the transaction address to cover the transaction fees prior to being able to transact USDT tokens from that address.

56. Based on their training and experience, agents know that the first input of TRX to initiate an address on the Tron blockchain is often from the subject who holds the private keys for that address.

57. Agents found that the FRAUD BOSS's **Binance Account 1** was used to initiate **Tron Blockchain Address 1**—the address that FRAUD BOSS used to receive the fraud proceeds that the CRYPTO EXCHANGER converted from bulk cash to USDT during the fraud scheme.

58. The FRAUD BOSS's **Binance Account 1** transaction records also showed multiple other interactions with **Tron Blockchain Address 1**.

59. Based on agents' training and experience, this pattern indicated to them that the holder of **Binance Account 1**—the FRAUD BOSS—also controlled **Tron Blockchain Address 1**.

60. Agents' blockchain tracing showed that USDT from **Tron Blockchain Address 1** made its way to the FRAUD BOSS's **Binance Account 1**.

COMPLAINT FOR CIVIL FORFEITURE                 10

61. Analysis of **Binance Account 1** showed that it was registered in 2018, but primarily active between 2021 and 2024. Cryptocurrency worth approximately $11 million was deposited into the account, while cryptocurrency worth approximately $10 million was withdrawn. This "pass through" transaction typology is indicative of money laundering, and consistent with crime trends agents are familiar with based on their training and experience.

62. On September 26, 2024, a magistrate judge in the Northern District of California signed a seizure warrant for the cryptocurrency held in **Binance Account 1** including 1,400,058.194019 USDT, (worth roughly $1,400,499 USD on 9/21/2025); 1,331,857.9667 DODO (worth roughly $192,074 USD on 9/21/2025); and 1,445.2634 PEOPLE (worth roughly $99 USD on 9/21/2025).

63. The seizure warrant was later executed by the government, and the Binance Funds were transferred to the custody of the U.S. Government.

## COUNT ONE

**Civil Forfeiture (Title 18, United States Code, Section 981(a)(1)(C)) for Wire Fraud (Title 18, United States Code, Section 1343)**

64. Civil forfeiture of the proceeds of wire fraud is authorized by Title 18, United States Code, Section 981(a)(1)(C). Specifically, Section 981(a)(1)(C) authorizes forfeiture of "any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." Section 1956(c)(7)(A) defines the term "specified unlawful activity" as including "any act or activity constituting an offense listed in section 1961(1) of this title." And Title 18, United States Code, Section 1961(1), in turn, includes violations of Title 18, United States Code, Section 1343 in its definition of racketeering activity.

65. The Defendant Property constitutes, and is derived from, the proceeds of wire fraud, and is thus subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C).

## COUNT TWO

**Civil Forfeiture (Title 18, United States Code, Section 981(a)(1)(A)) for Money Laundering (Title 18, United States Code, Section 1956(a)(1)(B)(i))**

66. Civil forfeiture of property involved in a money laundering transaction, or property traceable to such property, is authorized by Title 18, United States Code, Section 981(a)(1)(A), which allows the United States to forfeit "any property, real or personal, involved in a transaction . . . in violation of section 1956 . . . of this title, or any property traceable to such property."

67. A violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) occurs when a person conducts or attempts to conduct a financial transaction knowing that the transaction involves the proceeds of a specified unlawful activity when the transaction is designed in whole or part "to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activity; or . . . to avoid a transaction reporting requirement under State or Federal law", or involves property "traceable to such property."

68. Wire fraud is a specified unlawful activity pursuant to Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1). Thus, the Defendant Property is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A) because it was involved in, or is traceable to property involved in, money laundering transactions in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

**PRAYER FOR RELIEF**

69. The United States requests that due process issue to enforce the forfeiture of the above listed Defendant Property; that notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that the Court enter a judgment forfeiting the Defendant Property; and that the United States be awarded such other relief as may be proper and just.

DATED: October 29, 2025

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

　　　　/s/
DANIEL PASTOR
Assistant United States Attorney

**VERIFICATION**

I, Andrew P. Mundy, state as follows:

1. I am a Special Agent with Homeland Security Investigations. I am one of the agents working on this case. As such, I am familiar with the facts and the investigation leading to the filing of this Complaint for Forfeiture.

2. I have read the Complaint and affirm that the allegations contained therein are true.

\*   \*   \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 29th day of October, 2025 in San Francisco, California.

\_\_/s/_____
Andrew P. Mundy
Special Agent
Homeland Security Investigations